UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PAMELA DELVER,
    PLAINTIFF

VS.

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,
    DEFENDANT

CASE NO. 1:06CV00266
(WEBER, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

This case has had a long history. Plaintiff filed her application for Disability Insurance Benefits (DIB) in July, 1997. She alleged an onset date in May, 1994. Her application was denied both initially and upon reconsideration. She requested and obtained a hearing before an Administrative Law Judge (ALJ) in Dayton, Ohio in February, 1999. Plaintiff testified at the hearing as did Vocational Expert (VE) Vanessa Harris. After an unfavorable decision by the ALJ in May, 1999, Plaintiff requested review by the Appeals Council. After the Appeals Council refused review in August, 1999, Plaintiff filed her Complaint with this Court. Magistrate Judge Kemp recommended a remand and Judge Weber agreed.

A second hearing took place in Dayton, Ohio in December, 2004. Plaintiff also testified as did VE, Susan Srinivasan. The ALJ again reached an unfavorable decision in March, 2005. Plaintiff again sought review by the Appeals Council, which denied review in March, 2006. Plaintiff timely filed her Complaint with this Court and again seeks judicial review.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ committed three errors prejudicial to her case, the first of which is that the ALJ failed to follow the opinions of treating sources in preparing his residual functional capacity assessment and particularly regarding the interplay between physical and

mental impairments. The second is that the ALJ erred by basing his residual functional capacity assessment upon his lay interpretation of Plaintiff's medical record. The third is that the ALJ erred in minimizing Plaintiff's credibility and subjective reports of pain. We shall address these as one because they are multiple ways of stating the same thing.

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked a series of hypothetical questions. The first asked the VE to assume that Plaintiff had the residual functional capacity to perform medium work with no climbing and occasional bending, stooping, squatting, crouching and crawling. Plaintiff could occasionally push or pull, but could not reach above the shoulder level and should not be exposed to temperature extremes or humidity nor exposed to hazzards, such as dangerous machinery or unprotected heights. The VE responded that there would be a representative number of jobs at the medium, light and sedentary levels.

The second hypothetical adopted all the limitations of the first and added that Plaintiff be permitted to alternately sit and stand at 30-minute intervals. The VE then testified that the number of jobs at the medium and light levels would be markedly reduced, but that the same number of jobs (8,000) would remain at the sedentary level.

The third hypothetical asked the VE to adopt all the limitations of the second hypothetical and add that Plaintiff not be required to maintain concentration on a single task for more than 15 minutes. The VE responded that the last limitation would have no effect on the number of available jobs.

The fourth hypothetical added the further restriction that Plaintiff be limited to jobs with no production quotas. The VE responded that the same number of medium and light jobs would be available, but there would be a reduction in the number of sedentary jobs to about 2000.

Significantly, the VE was asked by Plaintiff's attorney to assume the accuracy of the reports of Drs. Fritsch and McIntosh as well as the psychiatrist from Comprehensive Counseling relative to Plaintiff's difficulty maintaining attention and behaving in an emotionally stable manner. The VE responded that if those reports were accurate, Plaintiff would be unemployable. (Tr., Pgs. 490-496).

## OPINION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff suffered from a number of severe impairments, to wit: "chronic neck pain status-post cervical laminectomy, myofascial pain syndrome attributed to a history of fibromyalgia without objective findings or adequate trigger-point examination, a mood disorder, a somatoform disorder, and a history of cannabis abuse with reported recent remission." The ALJ found that no impairment or combination of impairments met any Listing, that she had the residual functional capacity to perform light work within the restrictions imposed by the fourth hypothetical, and that she was therefore not disabled.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that she was 52 years of age as of the date of the hearing in December, 2004. She is 5'2" tall and weighed 150 lbs., which is about 30 lbs. above her normal weight and attributed to the "side effects of medication." She is left handed, single and the grandparent of a 12-year-old girl who has been in her care since infancy. She lives with her fiancé and her granddaughter in an apartment in Trenton, Ohio. She holds a GED and is a welfare recipient. She last worked as a cashier at Kroger in May, 1994 and left there after suffering a fall from a horse and sustaining a broken neck as well as fibromyalgia and depression. Although she didn't offer any testimony regarding her length of employment at Krogers, subsequent documents showed that she worked there for approximately 19 years.

Plaintiff described her disabling condition as "neck pain" and "tingling in my right arm, tendonitis in both elbows, carpel tunnel in both wrists, lower back and hip pain." No carpel tunnel surgery was performed or recommended. It was treated with ice and the use of splints. She has difficulty with fine finger movements and frequently drops things.

Plaintiff also said she is depressed, the symptoms for which are crying spells, excess sleep and isolation from others. She is presently in treatment for depression, takes medication and sees a psychiatrist on a bi-weekly basis. Plaintiff related that her depression seems to be cyclical and worsens every 6-7 months. She has been hospitalized for depression, but not recently. She feels tired and fatigued, sometimes nauseous and in neck, shoulder, arm, lower back and hip pain. The lower back pain tends to radiate down her right leg. Plaintiff evaluated her pain as a 6 or 7 on a scale of 10 and said that pain medication "takes the edge off," but does not eliminate pain. She

feels most comfortable sitting in her recliner. She has trouble sleeping, but has never had physical therapy, although she wears a pain patch.

Plaintiff estimated that she could walk "a little over half a block" and could stand "probably 15, 20 minutes" and sit "probably about the same." She can lift a gallon of milk with both hands and can climb steps "very slowly and sometimes with help." She is unable to do housework except some cooking in the microwave and occasional light shopping. She visits her mother and occasionally reads or sees a movie. She doesn't drink, smokes about 6 cigarettes per day and used marijuana for her pain.

She identified Dr. Jarrett as her family doctor and said that he has been treating her for the last 18 years. Plaintiff also identified Dr. Ongkiko as the neurosurgeon who fused the C5-6 and C6-7 discs at Middletown Hospital in August, 1994. (Tr. Pgs. 452-488).

## THE MEDICAL RECORD

Plaintiff first filed for disability benefits in February, 1995. In May, 1997, an ALJ denied benefits and that decision is now res judicata. The res judicata effect of the decision, denying Plaintiff's claim, by another ALJ following Plaintiff's pro se application for supplemental security income in October, 2001, decided in February, 2004, is an issue in this case. Although some of the evidence describing Plaintiff's physical condition may have been before the ALJ who decided Plaintiff's pro se claim in February, 2004, the psychiatric and psychological evidence was not. The parties agree that the relevant time period is May 30, 1997 to December 31, 2000, the date Plaintiff was last insured. The Court cannot consider evidence that Plaintiff's disability began after December 31, 2000, not under the theory that the ALJ's decision in February should not be given res judicata effect, but because December 31, 2000 was the date Plaintiff was last insured. This was the ALJ's conclusion and one with which we agree. However, evidence obtained after December 31, 2000 which demonstrates the continuation of an impairment arguably disabling before December 31, 2000 should not be ignored either.

An MRI of the cervical spine was done in July, 1994, showing a "large herniation of the C6-7 disc" with no chord compression and "minimal generalized bulging of the C5-6 disc." (Tr., Pg. 174). She saw Carlos Ongkiko, a neurosurgeon, in August, 1994. Plaintiff told Dr. Ongkiko that she had been in three automobile accidents, the last and most serious of which occurred in

approximately 1987 when she jammed her neck against the roof of the car. She was initially treated by a chiropractor and was symptom free until about 1991 when she experienced neck and right arm pain as well as numbness and tingling in her right arm. She was given muscle relaxants and physical therapy and while treating was thrown from a horse, landing on the back of her head. Additional physical therapy and cortisone injections didn't help, so an MRI was ordered and it showed a herniated cervical disc at C6-7 with radiculopathy. A CT scan also showed a bulge at C5-6. (Tr., Pgs. 178-179). A myelogram in August, 1994 confirmed the diagnosis of: "(1) normal lumbar region, (2) minimal to mild generalized bulge of the C5-6 intervertebral disc and (3) large right lateral herniated disc at C6-7." (Tr., Pg. 184). In August, 1994, Dr. Ongkiko performed an "anterior discectomy and fusion" of the C6-7 disc. (Tr., Pgs. 187-196). In December, 1994, Dr. Ongkiko cleared Plaintiff to return to work, but treated her for pain in both elbows. (Tr. Pg. 203). In December, 1994, an MRI indicated "very minimal annular bulging of the C4-5 disc." (Tr., Pgs. 207-208).

In June, 1996, Plaintiff consulted Sean Logan, M.D. of the Mayfield Clinic for post-surgical neck pain and bilateral arm pain. Dr. Logan regarded her neurological examination as "normal" and was "unable to demonstrate findings consistent with acute cervical radiculopathy or myelopathy," but felt that Plaintiff had "chronic fibromyalgia," a diagnosis in which Edward Herzig, M.D., a rheumatologist, concurred. He recommended aerobic and weight training. (Tr., Pgs. 209-211).

In October, 1997, Plaintiff was evaluated by Nancy McDonough, M.D. Dr. McDonough concurred in the diagnosis of fibromyalgia and felt that Plaintiff also suffered from depression. Like Dr. Logan, Dr. McDonough found no evidence of active cervical radiculopathy. Dr. McDonough felt that Plaintiff could lift 15 lbs. occasionally and 8-10 lbs. frequently. She could occasionally bend, stoop, squat, crouch and crawl, but should avoid neck extension. She should not climb ladders, but could sit for 1.0 to 1.5 hours, stand for 1 hour and walk for 1 hour at a time. (Tr., Pgs. 213-215). A X-ray of the cervical spine in October, 1997 showed "minor degenerative changes at C5-6." (Tr., Pg. 216).

Plaintiff was evaluated by Reva Minor, Psy.D., a clinical psychologist, who diagnosed her with "Dysthymic Disorder with Anxiety Symptoms." Dr. Minor assigned a GAF of 50-60. While Plaintiff reported problems with attention/concentration and short memory, "she

performed adequately in various tests requiring those abilities." (Tr., 221-224).

A residual functional capacity assessment was made by Myung Cho, M.D., in October, 1997. Dr. Cho opined that Plaintiff could lift 20 lbs. occasionally and 10 lbs. frequently. She could stand/walk about 6 hours and sit for about 6 hours in a workday. She should never climb ladders, but could occasionally climb a ramp or stairs, stoop and crouch. She could frequently balance, kneel and crawl. (Tr., Pgs. 226-233).

A psychological evaluation was done by Douglas Pawlarczyk, Ph.D., in October, 1997. Dr. Pawlarczyk found that Plaintiff had only slight restrictions of activities of ordinary living, maintaining social function and concentration, persistence or pace and had never experienced episodes of decompensation or deterioration. (Tr., Pgs. 234-243).

Jeffrey Jarrett, M.D., Plaintiff's primary care physician from July, 1989 to November, 1997, diagnosed her with "severe fibromyalgia, chronic low back pain and major depression." Dr. Jarrett reported that his patient's ability to sit, stand, walk, bend, lift and carry was "severely hampered" and her ability to understand and remember, socially interact and adapt and concentrate were "very poor due to intensity of pain and chronic fatigue." (Tr., Pgs. 244-245).

She was also evaluated by Derrick Richardson, Ph.D., in February, 1988. Dr. Richardson also found a slight restriction of activities or daily living and no evidence of decompensation or deterioration, but a moderate restriction of her ability to maintain social functioning and to concentrate and persist. (Tr., Pgs. 260-273).

In April, 1990, X-rays of the cervical spine were "normal." In December, 1995, Dr. Jarrett referred her to Edward Herzig, M.D., a rheumatologist. Dr. Herzig also agreed that Plaintiff has "primary fibromyalgia syndrome." (Tr., Pgs. 284-285).

Plaintiff was referred to Comprehensive Counseling Service by Dr. Jarrett in May, 1998 and was in treatment for approximately 6 months. Judith Freeland, M.D., diagnosed her with dysthymia. Counseling seemed to center around problems regarding her economic situation, finding housing and relationships with her ex-husband and children as well as her reports of physical pain caused by fibromyalgia. At the time, she was taking Soma, Percocet, Vistaril and Prozac and smoking marijuana daily. Dr. Freeland, the supervising psychiatrist, reported in February, 1999 that there was "genetic thread evidence of chemical dependency in Plaintiff's family, that she had tested positively for chemical dependence and had a history of being a

marital abuse victim." Dr. Freeland felt that Plaintiff's psychological/emotional problems were exacerbating her physical condition. She concluded: "I do not see her being able to function in the workplace at this time." (Tr., Pgs. 286-323 and 387-404)

Dr. Jarrett reported in November, 1998 that Plaintiff was diagnosed with "severe fibromyalgia, first diagnosed in 1994," as well as chronic neck pain and headaches and "a very long history of major depression." The diagnosis of fibromyalgia was confirmed by a rheumatologist. Dr. Jarrett, Plaintiff's primary care physician for a then 9-year period, said that Plaintiff's fibromyalgia has made her depression worse, that her problems are "extremely debilitating," and that "the majority of the time she has significant pain in multiple areas of her body." Dr. Jarrett stated: "I don't feel that these conditions will improve to the point that she will ever be able to return to any type of gainful employment." Dr. Jarrett felt that his patient's ability to cope with pain had deteriorated over time and that her "pain has caused severe limitations in her daily activity and restricts her to a very strong degree." (Tr., Pgs. 323-328). Dr. Jarrett also expressed his opinion that Plaintiff would not be prompt and regular in attendance, would not be able to withstand the pressure of meeting normal standards of work productivity, would not be able to sustain attention and concentration on her work, would not be able to perform work activities within a schedule and would not be able to complete a normal workday without interruption from psychologically and/or physically-based symptoms. She would, in Dr. Jarrett's opinion, be able to demonstrate reliability.

Plaintiff was tested and examined by J. William McIntosh, Ph.D. in January, 1999. At the time, Plaintiff was attending meetings of a fibromyalgia support group and was seeing a counselor. "Test scores were suggestive of persons who react to stress by developing physical symptoms." These type of persons "are slow to gain insight into the underlying causes of their behavior and quite resistant to psychological interpretations." Her test scores would classify her as in the range of "severe depression." Dr. McIntosh diagnosed her with somatization disorder and assigned a GAF of 50. "Ms. Delver's psychological problems, which involve her translating stress and pressure into bodily symptoms, are of sufficient severity to term her disabled and unable to engage in substantial gainful work activity on a sustained basis in a competitive work environment. Ms. Delver would not be able to undergo the rigors and pressures of day to day work activity." Dr. McIntosh opined that Plaintiff's physical symptoms were not under voluntary

control and that she was not a malingerer. (Tr., Pgs. 371-379 and 408-409).

Plaintiff was examined in February, 1999 by Hal Blatman, M.D., who also diagnosed her with fibromyalgia and myofascial pain syndrome. He recommended stretching, self-massage with the use of rubber balls and deep breathing as well as vitamins and, in addition, he made nutritional suggestions. Dr. Blatman also felt that myofascial trigger point injections and a program of physical therapy could be helpful. (Tr., Pgs. 407-408).

In May, 1996, Plaintiff was discharged from a physical therapy program at Middletown Regional Hospital for non-compliance, failure to show up for 3 scheduled appointments. (Tr., Pgs. 590 and 596-597). The therapy was for a diagnosis of fibromyalgia.

X-rays of the cervical spine in July, 2001 showed the fusion at C6-7 as well as degenerative bony spurring at C5 and degenerative narrowing of the C5-6 disc space. (Tr., Pg. 651). X-rays of the lumbar spine showed "mild facet joint sclerosis of the lower lumbar spine." (Tr., Pg. 652).

In October, 2004, Dr. Jarrett again reported on his patient's progress. This time, Dr. Jarrett reported that Plaintiff had been in his care for approximately 15 years. His diagnosis included chronic cervical neck pain, fibromyalgia, major depression, generalized anxiety disorder, bipolar disorder, chronic low back pain, chronic fatigue and gastroesophageal reflux disease. Dr. Jarrett again emphasized the "extremely debilitating" nature of her condition and again stated that her depression severely aggravates her chronic pain. He felt that she would have "multiple absences as well as obvious difficulty sustaining eight hours of any type of work." "She has extreme difficulties concentrating and paying attention to what she is doing." "She could not handle the normal stress of work." Dr. Jarrett describes his patient as "sincere, cooperative, shows up for appointments, follows his advice, takes her medications appropriately and is not a malingerer." (Tr., Pgs. 708-715).

Plaintiff was evaluated in December, 2004 by Dong Moon, M.D., a psychiatrist. Dr. Moon was employed by Plaintiff's attorney for an independent medical opinion. Dr. Moon was supplied with medical records from Dr. Jarrett, Butler Behavioral Services, Middletown Regional Hospital, Dr. Johnson, Dr. Fritsch, Sheely Chiropractic Clinic, Dr. McIntosh, Dr. Blatman, Dr. Freeland and therapist, Judith Frederick, Comprehensive Counseling Services, Dr. Minor, Dr. McDonough, and Dr. Logan. Dr. Moon also conducted his own examination and testing regime.

He diagnosed Plaintiff with Bipolar Disorder, Obsessive-Compulsive Personality traits, Chronic Pain Syndrome and assigned a GAF of 50. Dr. Moon's diagnosis was based on a reasonable medical certainty. He ruled out major depression because of episodes of mania and post-traumatic stress syndrome and stated that her current symptoms did not match the criteria. He did agree with Dr. McIntosh that Plaintiff suffered from undifferentiated somatoform disorder, but did not meet the Listing for same because her symptoms began after the age of 30. Most importantly, Dr. Moon expressed the opinion that Plaintiff's depressive symptoms affect her physical condition and that "the sum of these conditions is greater than if each were taken independently." Dr. Moon expressed the opinion that Plaintiff was not a malingerer, that her condition was "extremely debilitating" and that Plaintiff "has been disabled since she last worked." (Tr., Pgs. 719-737). Dr. Moon's opinion was that Plaintiff had poor to no ability to deal with work stress and poor to no ability to understand either detailed or complex job instructions, but that she had a fair ability to understand, remember and carry out simple job instructions. She had poor to no ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability.

Dr. Moon also completed a residual functional capacity assessment in which he opined that Plaintiff had "marked limitations" of her ability to perform activities of ordinary living, maintain social function, and her ability to concentrate and persist. There were four or more episodes of decompensation, each of extended duration. Dr. Moon provided several answers to Interrogatories, in one of which, expressed himself as follows: "It is my opinion that the stress of normal work expectations would cause an exacerbation of her physical condition, which in turn, would aggravate her psychiatric symptoms and it is my opinion that she would decompensate quickly." (Tr., Pgs. 737-753).

X-rays taken in November, 2001 of Plaintiff's cervical spine showed the fusion at C6-7 as well as degenerative bony spurring at C5 and narrowing of the C5-6 disc space. Bone density was normal. X-rays of the lumbar spine taken in August, 2001 showed mild facet joint sclerosis at L4-S1. (Tr., Pgs. 844-845).

Dr. Jarrett reported in January, 2002 that his patient "continues to be completely disabled" because of "severe fibromyalgia and chronic back pain." (Tr., Pg. 863). Dr. Jarrett described his patient's ability to relate to others, understand and follow directions and maintain

attention as "extremely limited." When asked whether she could withstand the stress and pressure associated with day to day work activities, Dr. Jarrett responded with "No Way!" He described her ability to sit, stand, walk, bend, lift and carry to be "all severely impaired." (Tr., Pgs. 864-875).

Plaintiff was a patient at the Sheely Chiropractic Clinic in Trenton, Ohio for the period between late July, 2001 to November, 2001. She was given chiropractic manipulations, electrical stimulation and treated with hydrocollator packs. (Tr., Pgs. 894-922).

Ms. Delver was examined by Stephen Fritsch, Psy.D., in November, 2001. Dr. Fritsch agreed with Dr. Moon about the cummulative effects of pain upon one's physical and emotional abilities as follows: "I believe there is a strong relationship between psychological and physical factors in this chronic pain condition. There may be 'secondary gain' derived from the multiple physical problems which could heighten the perception of pain and perception of disability even if this is not at a conscious level." Dr. Fritsch expressed the opinion that Plaintiff had the cognitive ability to understand and perform simple and detailed occupational functions, but "would have difficulty maintaining attention for the entirety of a full work day." Dr. Fritsch also felt that "stress tolerances would be limited," but that Plaintiff "would be capable of interacting appropriately with supervisors, coworkers and the public." Dr. Fritsch assigned a GAF of 55. (Tr., Pgs. 923-926).

Plaintiff was evaluated by John Malinky, Ph.D., a clinical psychologist, in January, 2002. Dr. Malinky diagnosed plaintiff with somatoform disorder. He felt that Plaintiff had a moderate restriction in her ability to perform the activities of daily living and a moderate restriction of her ability to concentrate and persist. She had only a mild restriction of her ability to maintain social functioning, but had suffered one or two repeated episodes of decompensation, each of extended duration. (Tr., Pgs. 927-946).

Then there is an evaluation by Mary Johnson, M.D., from January, 2002. Plaintiff reported to Dr. Johnson that she has constant neck pain which radiates to the shoulders, arms and hands and numbness in the feet and hands. She uses no neck brace, bedboard or heating pad, but soaks in a tub, has tried aromatherapy, cervical spine pillows, pain killers, muscle relaxants and magnets. She has had cervical disc surgery and has been hospitalized two or three times for depression. Her "memory, orientation, appearance and ability to relate are normal" as is her

"intellectual functioning." She has "intact reflexes and motor function." Range of motion in the cervical spine is "mildly diminished" with no evidence of radiculopathy. Strength in both hands is intact. Dr. Johnson diagnosed Plaintiff with "myofascial pain syndrome" and opined that she was "capable of performing sedentary, light and moderate work-related duties." Dr. Johnson recognized that Plaintiff had emotional problems and confined her analysis to Plaintiff's observable physical condition. (Tr., Pgs. 946-950).

Dr. Jarrett reported in August, 2003 that "Pam Delver continues to be totally disabled due to severe fibromyalgia and chronic back pain that is quite debilitating. I do not see that this will improve in the near future." A treatment note that same month reflects the following: "Pam . . . is crying a lot . . . and just seems miserable. She has severe fibromyalgia, chronic pain. She is on Duragesic Patches and just does not know what to do." (Tr., Pgs. 956-957).

## LEGAL STANDARD

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321 (6th Cir. 1978); *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano*, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. See also *Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.*, 508 F. Supp. 726, 730 (S.D. Ohio 1981).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111

S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

## OPINION

Plaintiff argues that the ALJ considered her depression and fibromyalgia in a vacuum and failed to consider these two impairments in combination when assessing her residual functional capacity. The ALJ found that Plaintiff could perform light work with certain restrictions designed to accommodate her physical limitations, specifically her neck and low back pain. She required a sit/stand option at 30 minute intervals. She could not climb or reach above her shoulders and could occasionally bend, stoop, squat, crawl, crouch, push or pull, but should not work in temperature extremes. In his initial decision prior to remand, the ALJ concluded that Plaintiff had the severe impairments of chronic neck pain status post laminectomy and fibromyalgia. In his post-remand decision, the same ALJ concluded that Plaintiff had the same

chronic neck pain, but characterized the latter impairment as "myofascial pain syndrome attributed to a history of fibromyalgia without objective findings or adequate trigger-point examination." In his pre-remand decision, the ALJ concluded that Plaintiff suffered from depression and somatization disorder. In his post-remand decision, the ALJ found that Plaintiff suffered from "a mood disorder and a somatoform disorder." It would appear that notwithstanding Plaintiff's argument that the ALJ failed to consider the combined effect of her functional impairments, he also lessened the individual impact of both fibromyalgia and depression. This makes sense only if Plaintiff's impairments were improving. The medical evidence, however, demonstrates the opposite.

The diagnosis of fibromyalgia was first made in 1996 by Dr. Logan of the Mayfield Clinic. The diagnosis was confirmed by Dr. Herzig, a rheumatologist. Dr. McDonough also concurred in the diagnosis of fibromyalgia in 1997, as did Dr. Blatman in 1999. Dr. Jarrett, Plaintiff's treating and primary care physician for 15 years, also concurred in the diagnosis of fibromyalgia and treated her for fibromyalgia. At the time of Plaintiff's examination by Dr. McIntosh in 1999, she was attending a fibromyalgia support group. We know that fibromyalgia is diagnosed by a mapping of trigger points and is sometimes treated with injections at trigger points, which was part of the treatment regime recommended by Dr. Blatman. The sole piece of medical evidence that Plaintiff suffered from "myofascial pain syndrome" came from Dr. Johnson in 2002. The overwhelming weight of the medical evidence is so convincing that Plaintiff has and had fibromyalgia that any conclusion to the contrary could not be based on substantial evidence.

The quality of proof regarding Plaintiff's mental impairment is not quite as strong. Dr. Minor, a clinical psychologist, thought Plaintiff has Dysthymic Disorder in 1997, a conclusion confirmed by Dr. Freeland, a psychiatrist in 1999. Dr. McIntosh diagnosed her with Somatization Disorder and Severe Depression in 1999. Dr. Moon, also a psychiatrist, thought she was Bipolar, had Obsessive-Compulsive Personality Traits and Chronic Pain Syndrome. Dr. Moon also thought Plaintiff had Somatoform Disorder, but agreed with Drs. McIntosh and Freeland that Plaintiff's depressive symptoms were debilitating and rendered her unemployable on a full-time basis. We know that Plaintiff was hospitalized at least twice for depression at an earlier time. Plaintiff's long time primary care physician also agreed that Plaintiff's depressive

symptoms were debilitating.

Despite the apparent disagreement over the proper diagnosis for Ms. Delver's mental impairment, there is general agreement with the functional effect of her impairment. The treating sources concur that plaintiff's mental impairments would limit, to an extreme degree, her ability to react to and adjust to everyday stresses and pressures associated with full-time work. That was the message conveyed by Drs. McIntosh, Jarrett and Moon. To a lesser degree, Plaintiff also presented proof that her inability to concentrate and attend would preclude full-time employment. Although Dr. Minor disagreed and Dr. Pawlarczyk found only a slight functional impairment, Drs. Richardson and Malinky found a moderate impairment and Dr. Fritsch didn't believe that Plaintiff could maintain and attend for a full work day. In any event, we fail to see that the ALJ's error, if he made one, could be considered prejudicial in light of the fact that his residual functional capacity assessment included an accommodation for attention/concentration problems by limiting Plaintiff to jobs which did not require maintaining concentration on a single task for longer than 15 minutes. However, the ALJ's conclusion that Plaintiff's inability to handle stress could be accommodated by limiting her to jobs not requiring production quotas is both erroneous and prejudicial.

Plaintiff's emotional problems make her physical symptoms, residual pain from her neck injury and subsequent disc fusion as well as generalized pain from fibromyalgia, worse. Drs. Freeland, Jarrett, McIntosh and Moon all agree on this point. They also all agree that Ms. Delver is not a malingerer and her 19-year history as a Kroger cashier would support that point. An additional issue was Plaintiff's ability to behave in an emotionally stable manner in the workplace. Although Drs. Jarrett and Moon felt that she could not, the bulk of medical opinion was that she could, as we learned from the reports of Drs. Pawlarczyk, Richardson, Fritsch and Malinky. The ALJ could have reasonably accepted the consensus of medical opinion regarding Plaintiff's ability to behave in a socially acceptable manner and concluded that Plaintiff could so behave, but there is an absence of substantial evidence supporting the ALJ's apparent conclusion that Plaintiff's physical and mental impairments could be evaluated independently. Dr. Fritsch referred to the cumulative effects of the psychological and physical factors as "secondary gain" which heightens the perception of pain, a phenomenon that occurs at a subconscious level. Dr. McIntosh also described "secondary gain" as being other than voluntary. As previously stated,

the combination of physical and mental factors affects Plaintiff's ability to react to workplace stresses and cannot be accommodated by eliminating production quotas under the naive notion that production quotas are the sole causes for workplace stress.

This is a case wherein Plaintiff's claim is supported by her primary care physician who has talked to, examined, and treated her for a remarkably long period of time. She has suffered a number of traumatic events, any or all of which could have contributed to the damage done to her neck and for which she had cervical disks fused. In addition, she has taken prescription pain killers, muscle relaxants, soaks in a hot tub and has consulted a number of specialists, including a rheumatologist. There is a consensus that her reports of severe pain do not constitute malingering. To resort to magnets is likely a self-treatment which is unlikely to be productive. To spend an inordinate amount of time in a recliner is, however, quite understandable. Dr. Jarrett describes his patient as "miserable" and "crying a lot." Her chronic pain is exacerbated by her equally chronic depression. Her 900+ page medical record is replete with findings of no radiculopathy, normal x-rays of her low back, normal bone density, etc., all of which demonstrate that there is minimal physical reasons for Plaintiff's subjective reports of generalized pain. Yet Plaintiff reports that she is in severe pain constantly and her doctors believe her. The diagnosis of fibromyalgia is inherently subjective, but the consensus of doctors who agree on that diagnosis is more convincing than a map of trigger points. She plods along attempting to obtain relief from her pain and even resorts to smoking marijuana as she has attempted to find any judge who will look at the big picture. Well, she has found one.

**IT IS THEREFORE RECOMMENDED** that the ALJ's decision of March 9, 2005 be reversed and that Plaintiff recover disability benefits for the relevant period.

September 14, 2007

Timothy S. Hogan
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PAMELA DELVER,
    PLAINTIFF

CASE NO. 1:06CV00266
(WEBER, J.)
(HOGAN, M.J.)

VS.

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,
    DEFENDANT

NOTICE

Attached hereto is the Report and Recommended Decision of the Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on 9-26-2007. Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).